In re FINLEY, KUMBLE, WAGNER, HEINE, UNDERBERG, MANLEY, MYERSON & CASEY, Debtor.

Bankruptcy No. 88 B 10377.

United States Bankruptcy Court, S.D. New York.

Oct. 29, 1993.

See also 149 B.R. 365.

E. Zujkowski, Emmet, Marvin & Martin, New York City, for J.D.B. Kimball, Trustee of the Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey Amended and Restated Defined Benefit Plan ("Pension Trustee").

J. Sarna, Esq., Togut, Segal & Segal, New York City, for Official Committee of Unsecured Creditors and F.H. Musselman ("Liquidation Trustee").

S. Birnbaum, M. Mora, Washington, DC, for Pension Benefit Guar. Corp. ("PBGC").

## MEMORANDUM OF DECISION ON OBJECTIONS TO CLAIMS AND SUMMARY JUDGMENT

FRANCIS G. CONRAD, Bankruptcy Judge.*

This contested matter [1] is before us [2] on an application for an order reclassifying, expunging, and disallowing certain claims, a cross motion for the imposition of a constructive trust and a corresponding motion for summary judgment. The issues presented concern the priority of certain minimum funding requirements and various statutory liabilities arising from the underfunding of debtor's pension plan qualified under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (1993). We hold that (1) minimum funding obligations arising postpetition under ERISA are prepetition contingent claims not entitled to an administrative priority; (2) claims for unpaid contributions and asset insufficiencies are disallowed to the extent that they are duplicative; and (3) the total funding deficiency shall be offset by the allowed amount of the minimum funding claim. Summary

---

* Sitting by special designation.

1. Our subject matter jurisdiction arises under 28 U.S.C. § 1334(b) (1993) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(B) (1993). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Fed.R.Bankr.P. 7052.

2. Chief Bankruptcy Judge Lifland transferred this matter to us on January 12, 1993, in the interest of maintaining an equitable distribution of cases.

judgment is granted on all aforementioned issues, albeit with clarifications and limitations discussed below. Summary judgment is denied concerning the cross motion for a constructive trust.

## BACKGROUND

On February 24, 1988 ("Petition Date"), bank creditors filed an involuntary Chapter 7 petition, 11 U.S.C. § 101 *et seq.*[3], against Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey ("Debtor"), a large, nationally recognized law firm headquartered in New York.[4] Bankruptcy Judge Abram converted Debtor's Chapter 7 case to Chapter 11 and appointed F.H. Musselman Chapter 11 Trustee ("Liquidation Trustee"). On March 9, 1989, Bankruptcy Judge Abram authorized the appointment of J.D.B. Kimball ("Pension Trustee") as trustee of Debtor's Amended and Restated Defined Benefit Trust ("Pension Plan").

Bankruptcy Judge Abram confirmed Debtor's Plan of Reorganization ("Plan") on December 12, 1991.[5] The effective date of the Plan was March 19, 1992. The Plan created a Liquidating Trust and a Partner Settlement Trust from which Debtor has paid or will pay allowed claims.

## FACTS

Before the Petition Date, Debtor employed as many as 240 partners, 450 associates and attorneys of counsel, and 1000 support personnel.

On October 30, 1985, Debtor sponsored the Pension Plan to administer retirement income benefits to its nonattorney employees. The Pension Plan has 746 participants.[6] By the Petition Date, substantially all of the Pension Plan participants were no longer in Debtor's employ.[7]

On May 17, 1991, Pension Trustee notified plan participants that Pension Trustee intended to terminate the Pension Plan effective August 1, 1991. See ERISA § 4041, 29 U.S.C. § 1341 (1993). Despite Pension Trustee's notice to the contrary, the Pension Plan remains active, albeit underfunded.[8]

In conjunction with the Pension Plan, Debtor maintained qualified individual defined benefit plans ("IDBs") on behalf of its partners. At least sixty-six of Debtor's unincorporated partners received benefits through IDBs.[9] Shortly before the Petition Date, Debtor terminated most of its IDBs. Debtor then distributed vested accrued benefits and applicable surpluses to participating partners after the Petition Date.

Debtor's plan of reorganization created both a Liquidating Trust and a Partner Settlement Trust from which Debtor has paid or will pay allowed claims. Participating partners contributed funds to the Partner Settlement Trust in accordance with their respec-

---

3. Unless otherwise indicated, all statutory references are to Title 11.

4. For a concise summary of the facts leading to Debtor's bankruptcy, see Trustee's Second Amended Disclosure Statement for Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 94–104 (Ch. 11 Case No. 88 B 10377, Docket No. 1377, Entered Feb. 13, 1991).

5. Pension Trustee objected to confirmation of Debtor's Plan. In a stipulation dated October 22, 1991, Trustee and Pension Trustee agreed to resolve the issues raised in Pension Trustee's objection at a later date.

6. J.D.B. Kimball Affidavit, ¶ 4, dated June 8, 1992.

7. Pension Trustee states that sixty-eight employees remained in Debtor's employ following the Petition Date. Of these sixty-eight employees, at least thirty-eight were Pension Plan participants. No employee worked past June 30, 1988. Response and Reply of J.D.B. Kimball, As Trustee of the Debtor's Amended and Restated Defined Benefit Plan, ¶ 8, 9 (Docket No. 2068, Filed October 23, 1992).

8. During oral argument on May 4, 1993, counsel for PBGC stated that the Pension Plan "has not been terminated" and therefore remains a "viable entity." Transcript, p. 21. This is not disputed by anyone.

9. Debtor and its professional associations and corporations may have maintained as many as 125 IDBs on behalf of its individual partners. Trustee's Second Amended Disclosure Statement for Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 53–54 (Ch. 11 Case No. 88 B 10377, Docket No. 1377, Entered Feb. 13, 1991).

tive net worths and earning potentials.[10] The parties dispute whether contribution calculations included surpluses paid following termination of the relevant IDBs. The extent to which tax savings were calculated as part of the respective partners' net worths also remains unclear. We need not decide this factual dispute in our resolution of this summary judgment motion.

Pension Trustee and the Pension Benefit Guaranty Corporation ("PBGC") filed seven proofs of claim related to the Pension Plan and the IDBs.[11] Four claims are relevant here. Pension Trustee seeks (1) $161,729 for postpetition minimum funding contributions ("Minimum Funding Claim") (this claim also includes a contingent claim estimated at $56,006 for postpetition premiums that Pension Trustee may owe to PBGC)[12]; (2) $1,366,885 for unpaid prepetition plan contributions ("Deficiency Claim")[13]; and (3) $190,613 for plan contributions due within 180 days of the Petition Date ("Priority Claim").[14] In the fourth claim, PBGC seeks payment for Debtor's underfunded benefit liabilities (the "Underfunded Benefit Claim").[15] Only PBGC's claim is unliquidated. Both PBGC and Pension Trustee argue that their claims for unpaid minimum annual contributions and unfunded benefit liabilities are entitled to administrative priority status under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1).

On October 9, 1991, the Official Committee of Unsecured Creditors ("Committee") moved by order to show cause to reclassify, disallow, or expunge the various claims filed by PBGC and Pension Trustee. Committee argues that the relevant claims are not administrative priorities under § 503(b)(1)(A) because they arose from prepetition transactions with Debtor from which there was no resulting direct benefit to the estate and that PBGC's claim for unpaid contributions is duplicative of Pension Trustee's claims.

On June 8, 1992, Pension Trustee filed a notice of cross motion to impose a constructive trust on assets wrongfully distributed to IDB participants ("cross motion").[16] Also on June 8, 1992, Liquidation Trustee, as successor to claims previously asserted by the Committee, filed a motion for summary judgment to deny the cross motion and to reclassify, disallow, or expunge the various claims filed by Pension Trustee and PBGC.

10. As of December 9, 1991, 253 of Debtor's 284 former partners contributed an aggregate of $36,823,540 to the Partner Settlement Trust. Liquidation Trustee's Statement Pursuant to Local Bankruptcy Rule 13(h), ¶ 9, Docket No. 2048, dated Sept. 14, 1992.

11. PBGC is a wholly owned United States Government corporation created to administer and enforce Title IV of ERISA. *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633, 636, 110 S.Ct. 2668, 2671, 110 L.Ed.2d 579 (1990), *citing* 29 U.S.C. § 1302 and 120 Cong.Rec. 29950 (1974) (statement of Sen. Bentsen). PBGC oversees the mandatory government insurance program that protects the pension benefits of millions of private-sector American workers who participate in qualified plans.

Justice Blackmun, writing for the majority in *LTV Corp., supra*, provided the following summary:

In enacting Title IV, Congress sought to ensure that employees and their beneficiaries would not be completely deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.... Title IV covers virtually all defined benefit pension plans sponsored by private employers. A defined benefit plan is one that promises to pay employees, upon retirement, a fixed benefit under a formula that takes into account factors such as final salary and years of service with the employer.

*Id.*, 496 U.S. at 637 n. 1, 110 S.Ct. at 2671 n. 1. (citations omitted).

12. *See* proof of claim number 1640, filed March 10, 1989.

13. *See* proof of claim number 1646, filed June 3, 1991.

14. *See* proof of claim number 1647, filed June 3, 1991. The parties agree that claim number 1647 is a priority claim under 11 U.S.C. § 507(a)(4) (1988). The amount of the claim remains disputed. Transcript, May 4, 1993, p. 11.

15. *See* proof of claim number 1355, filed November 16, 1988.

16. According to the Confirmation Order, Pension Trustee may assert, without violating the permanent injunction, any direct claim (as opposed to a derivative claim assertable on behalf of the Debtor or its estate) against any partner relating to the termination of IDBs. *See* Order Confirming Trustee's Third Amended Chapter 11 Plan for Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, ¶ D(c), p. 19, dated December 9, 1991.

On May 4, 1993, a hearing was held regarding Liquidation Trustee's application to reclassify or disallow the claims and Liquidation Trustee's motion for summary judgment. Following oral argument, we reserved decision.

After we reserved decision, the parties engaged in a verbose volley of correspondence concerning whether three vacated decisions maintain persuasive authority in this district. All three decisions present issues similar to those presented here. *See, e.g., LTV Corp. v. Pension Benefit Guar. Corp. (In re Chateaugay Corp.),* 115 B.R. 760 (Bankr.S.D.N.Y. 1990), *aff'd,* 130 B.R. 690 (S.D.N.Y.1991) (vacated by request of the parties). No formal pleadings or briefs were filed. Notwithstanding our strong dislike for letter pleadings, the lack of briefs may ultimately be for the best because, as we discuss below, the vacatur issue merits little more than academic attention in the resolution of the matters now before us.[17]

## DISCUSSION

■ Fed.R.Civ.P. 56(c), applicable here under Fed.R.Bankr.P. 7056, provides that summary judgment shall be rendered if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The primary purpose of granting summary judgment is to avoid unnecessary trials where no genuine issue of material fact is in dispute. A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ The moving party bears the burden of showing that there is an absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106

S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, the evidence is considered in a light favorable to the party opposing the motion. Similarly, the inferences to be drawn from the underlying facts must be viewed in a light favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 599, 106 S.Ct. 1348, 1362, 89 L.Ed.2d 538 (1986) (White, J., dissenting). Our responsibility in considering a motion for summary judgment is not to resolve issues of fact but to assess whether there are factual issues to be tried. *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992).

■ When a motion for summary judgment is made and supported by the movant, Fed.R.Civ.P. 56(e) requires the nonmoving party to set forth specific facts demonstrating that genuine issues of material fact remain for trial. *Matsushita Elec. Indus. Co., Ltd., supra,* 475 U.S. at 586–87, 106 S.Ct. at 1355. The nonmovant must set forth the disputed facts in supporting materials, including affidavits, rather than defer to the pleadings alone. As the Supreme Court has noted, the nonmoving party must do more than show mere metaphysical doubt as to the material facts to defeat the motion. *Id.,* 475 U.S. at 586, 106 S.Ct. at 1355–56.

Applying the above standards, we find no material facts in dispute concerning Liquidation Trustee's motion to reclassify, disallow, or expunge the relevant claims. We note, however, that the dollar amounts of certain claims remain in dispute pending resolution at trial and the completion of actuarial calculations.

■ We first direct our attention to the Minimum Funding Claim for mandatory postpetition statutory contributions and insurance premiums. Both ERISA and the Internal Revenue Code mandate that every employer maintaining a qualified benefit plan provide minimum funding contributions. *See generally,* ERISA § 302(a), 29 U.S.C. § 1082

---

**17.** The Second Circuit has stated that the "practice of 'litigation by letter', although common, is an insufficient means of seeking relief from a court." *Peart v. City of New York,* 992 F.2d 458, 463 (2d Cir.1993), *quoting, In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687, 692 n. 6

(Bankr.S.D.N.Y.1992) (" 'Litigation by Letter', although a pervasive practice in the Southern District, 'has been repeatedly criticized and condemned by the ... judges in this district' because it 'contributes to the confusion and overload of an already burdened system....' ")

(1993); Internal Revenue Code § 412(a), 26 U.S.C. § 412(a) (1993). Each plan sponsor must establish and maintain a ledger account, known as a funding standard account, containing funds sufficient to satisfy the minimum funding standard. A plan satisfies the minimum funding requirements if, as of the end of plan year, the plan does not have an accumulated funding deficiency in its funding standard account. Failure to pay minimum funding contributions may result in termination of the plan.

Pension Trustee alleges that Debtor has paid neither minimum funding contributions owed for the plan year ending January 31, 1988, nor any subsequent minimum funding amounts. In addition, PBGC alleges that Debtor owes premiums for the plan year ending January 31, 1989, and for all years thereafter.

There is no disagreement among the parties that the Pension Plan is underfunded. Rather, the parties dispute whether the Minimum Funding Claim warrants administrative priority treatment for all funding amounts due postpetition, whether the amounts due are administrative in part and therefore subject to be prorated, or whether the funding claim is, in toto, merely a general unsecured claim.

Bankruptcy Code § 507(a)(1) lists seven tiers of priority claims, all of which are paid before any distributions are made to nonpriority unsecured creditors.[18] Administrative claims against a debtor's estate, as defined in § 503(b)(1)(A), are entitled to priority over all other unsecured priority claims.

■■■ Section 503(b)(1)(A) defines administrative claims as "actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case."[19] Congress granted priority to administrative expenses to "facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all the estate's creditors." *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir.1986), *citing, In re Mammoth Mart, Inc.,* 536 F.2d 950, 953 (1st Cir.1976) (granting priority to administrative expenses encourages new creditors to conduct business with the debtor).

■■■ The applicable two-pronged test, first laid out in *Mammoth Mart, supra,* requires that an administrative claim (1) arise out of a postpetition transaction between the creditor and the trustee or debtor in possession and (2) be allowable only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor's estate in the operation of its business. *In re Mammoth Mart,* 536 F.2d at 954; *Amalgamated Ins. Fund, supra,* 789 F.2d at 101; *In re CIS Corp.,* 142 B.R. 640, 643 (S.D.N.Y.1992); *In re New York Trap Rock Corp.,* 137 B.R. 568, 572 (Bankr.S.D.N.Y.1992); *In re Drexel Burnham Lambert Group Inc.,* 134 B.R. 482, 489 (Bankr.S.D.N.Y.1991) (citations omitted); *In re Chateaugay Corp., supra,* 115 B.R. at 772 (Bankr.S.D.N.Y.1990), *aff'd,* 130 B.R. 690 (S.D.N.Y.1991).

In addition, strict construction of the terms "actual" and "necessary" keeps "administrative expenses at a minimum ... to preserve the estate for the benefit of all its creditors." *In re Drexel Burnham Lambert Group Inc., supra,* 134 B.R. at 488 (*quoting, Otte v. United States,* 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974)).

■■■ A claim is not entitled to priority simply because the right to payment arose after the commencement of the reorganization proceeding. *Amalgamated Ins. Fund, supra,* 789 F.2d at 101 (citation omitted). Rather, a claimant must show that the debtor induced the creditor's performance to the

---

**18.** Section 507 of Title 11 provides, in pertinent part
 (a) The following expenses and claims have priority in the following order:
 (1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.

**19.** Consistent with § 102(3), "including" is not a word of limitation. *LTV Corp. v. Pension Benefit Guar. Corp. (In re Chateaugay Corp.),* 115 B.R. 760, 771 (Bankr.S.D.N.Y.1990), *aff'd,* 130 B.R. 690 (S.D.N.Y.1991) (vacated by request of the parties). *See* 3 L. King, Collier on Bankruptcy ¶ 503.04 at 519–20 (15th ed. 1992).

benefit of the estate. A presumption exists that creditors act primarily in their own interests and not for the benefit of the estate. *In re United States Lines, Inc.*, 103 B.R. 427, 430 (Bankr.S.D.N.Y.1989), *aff'd*, 1991 WL 67464, No. 90 Civ. 3823 (MGC) (S.D.N.Y. April 22, 1991).

A claimant must satisfy the *Mammoth Mart* test by a preponderance of the evidence. *In re Drexel Burnham Lambert Group Inc.*, *supra*, 134 B.R. at 489 (citation omitted); *In re O.P.M. Leasing Serv., Inc.*, 60 B.R. 679, 680 (Bankr.S.D.N.Y.1986).

Pension Trustee argues that the Minimum Funding Claim, like a severance claim, is an administrative priority claim under §§ 503(b)(1) and 507(a)(1). Rejecting established case law outside the confines of severance claims, Pension Trustee asks that we look beyond the two-part *Mammoth Mart* test in our resolution of the Minimum Funding Claim.

In support of Pension Trustee, PBGC argues that the facts underlying the Minimum Funding Claim satisfy both prongs of the *Mammoth Mart* test. PBGC contends that the Minimum Funding Claim arose from the maintenance of the Pension Plan in the postpetition period and that the estate obtained a direct benefit from tax exemptions that Debtor's partners received following the termination of their IDBs. According to PBGC, the tax-qualified status of the IDBs "increased the partners' collective net worth by at least $1.8 million."[20] This tax savings allegedly increased the dollar amount of the Partner Settlement Trust from which Debtor paid and will pay allowed claims.

Liquidation Trustee responds that the Minimum Funding Claim merits merely unsecured treatment because the claim does not arise from a postpetition transaction with Debtor and that the transactions did not in any way benefit Debtor's estate. In support of this position, Liquidation Trustee cites numerous cases upholding the general rule expressed in *Mammoth Mart, supra.*

▮ In the Second Circuit, severance pay arising from the postpetition termination of an employee is generally entitled to an administrative priority, even if severance pay is calculated according to the length of prepetition employment. *Straus–Duparquet, Inc. v. Local No. 3 International Brotherhood of Electrical Workers*, 386 F.2d 649, 651 (2d Cir.1967); *Rodman v. Rinier (In re W.T. Grant Co.)*, 620 F.2d 319, 320 (2d Cir.1980), *cert. denied*, 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980). According to *Straus–Duparquet*, severance pay is not earned from day to day and does not accrue.[21] The Court stated that "[a]fter the period of eligibility is served, the full severance pay is due whenever termination of employment occurs." Because severance is compensation for termination of employment, if termination is "an incident of the administration" of the debtor's estate, severance pay is "entitled to priority as such an expense." *See Amalgamated Ins. Fund, supra*, 789 F.2d 98, 104 ("[S]everance pay is compensation for the hardships which all employees, regardless of their length of service, suffer when they are terminated and . . . is therefore 'earned' when the employees are dismissed.") *See also, Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 711 (Bankr. S.D.N.Y.1992).

▮ Although Pension Trustee correctly states the Second Circuit rule that severance pay arising from postpetition termination is entitled to an administrative priority, we are unwilling to apply the severance pay rule to

---

20. *See* Supplemental Memorandum of PBGC In Opposition to the Liquidation Trustee's Motion for Summary Judgment, p. 11 (Docket No. 2139, Dated April 30, 1993).

21. Although *Straus–Duparquet* is the law of this Circuit, its reasoning is somewhat suspect in light of the statutory requirement that an administrative expense must benefit the estate. Indeed, the Second Circuit stands alone in holding that severance pay is always an administrative expense when termination occurs postpetition, regardless of the dubious benefit to the estate. In other Circuits, severance is prorated on the basis of an employee's length of service with its employer. *See In re Roth American, Inc.*, 975 F.2d 949 (3rd Cir.1992); *Lines v. System Bd. of Adjustment No. 94 Bhd of Railway, Airline & Steamship Clerks (In re Health Maintenance Foundation)*, 680 F.2d 619 (9th Cir.1982); *In re Mammoth Mart, Inc., supra*, 536 F.2d 950.

claims for minimum funding obligations. Administrative priorities are narrowly construed to permit equality of distribution among similarly situated creditors. *Amalgamated Ins. Fund, supra,* 789 F.2d at 101 ("[i]f one claimant is to be preferred over others, the purpose should be clear from the statute"), *quoting, Nathanson v. NLRB,* 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952)); *In re CIS Corp., supra,* 142 B.R. at 642; *In re New York Trap Rock Corp., supra,* 137 B.R. at 572; *In re Chateaugay Corp., supra,* 115 B.R. at 771 (citations omitted).

■ In our view, the obligation to pay minimum funding requirements is a prepetition debt not entitled to priority insofar as it relates to prepetition labor by Debtor's employees. Clearly, Debtor created its Pension Plan prepetition in consideration of its employees' labor. Although it appears that most of minimum funding claim amount is related to prepetition employment, some of the claim amount is also based on postpetition consideration. To the extent that the Minimum Funding Claim arose postpetition from the postpetition labor of Debtor's remaining thirty-eight employees, the Minimum Funding Claim merits priority treatment. Postpetition premiums due to PBGC may be entitled to an administrative priority for the same reason.

Prepetition funding contributions were not necessary to preserve debtor's estate or to promote the administration of the case. Debtor did not promise pension benefits to induce its employees, with the possible exception of the thirty-eight who remained in its employ, to remain on the job postpetition. Moreover, there was no transaction between the Pension Trustee and the debtor's estate, let alone a transaction that created a benefit for the estate. Pension Trustee therefore satisfies neither element of *Mammoth Mart.* The Minimum Funding Claim is thus a general unsecured claim except to the extent that funding requirements and applicable premiums accrued postpetition from the la-

bor of Debtor's remaining thirty-eight employees. The claims will be prorated at trial.[22]

PBGC's argument that the minimum funding contributions created a tax savings that benefitted the estate is unpersuasive. Although the minimum funding requirements allowed the IDBs to remain qualified, thereby benefitting the individual partners whose funds supported the Partnership Settlement Trust under the Plan, the argument that this tax benefit accrued to the estate rather than to the individual partners is illogical. More likely than not, Debtor's partners avoided or at least deferred individual tax liability following the liquidation of the IDBs on the basis of the qualified status of the Pension Plan, but it is doubtful that Debtor paid the prepetition surpluses exclusively for the benefit of its estate. Indeed, notwithstanding the funding deficiencies in the Pension Plan, that Debtor paid IDB surpluses at all shows a lack of regard for the funding of the nonattorney plan.[23] Whatever motives prompted the payment of surpluses to partners, we are confident that Debtor and its partners were not concerned about the well-being of the Pension Plan and its many participants, let alone the administration of Debtor's estate.

■ The maintenance of a pension plan postpetition does not alone give rise to an administrative priority claim. As Chief Bankruptcy Judge Lifland reasoned in *In re Chateaugay, supra,* 115 B.R. 760, 774, the "triggering event" in an ERISA-related claim is the prepetition labor of Debtor's employees. Thus, when a debtor's "obligations stem from contractual liability, even a postpetition breach will be treated as giving rise to a prepetition liability [if] the contract was executed prepetition." *Id.* (citations omitted). We, too, find that statutory funding requirements relate to the prepetition creation of the benefit plan. Our conclusion rests on both the Code's expansive definition of a claim and the timing of the so-

---

**22.** We do not assume the necessity of a trial. Informed accountants for all parties should be able to quantify the proration.

**23.** As Pension Trustee alleges in the cross motion for imposition of a constructive trust, *infra,* the conduct of Debtor and its partners may constitute a breach of fiduciary duty.

called triggering event that gave rise to the Minimum Funding Claim.

In *Indian Motorcycle Associates, Inc. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 151 B.R. 674, 681 (Bankr.S.D.N.Y.1993), *aff'd,* 157 B.R. 532 (S.D.N.Y.1993), we stated that "in bankruptcy, a claim is broadly defined [by § 101(5) ] as a 'right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured....' " (quoting 11 U.S.C. § 101(5)). The Second Circuit has held that the definition of a claim is "all encompassing" because Congress intended that "virtually all obligations to pay money [would] be amenable to treatment in bankruptcy proceedings." *Robinson v. McGuigan (In re Robinson),* 776 F.2d 30, 34–35 (2d Cir.1985), *rev'd sub nom. on other grounds,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). *See In re Chateaugay Corp., supra,* 115 B.R. at 773–74 (quoting legislative history that claims are broadly defined to permit debtors broadest possible relief).

■ The time a claim arises is determined by bankruptcy law in the absence of an overriding nonbankruptcy federal policy or interest. *In re Chateaugay Corp., supra,* 115 B.R. at 773 (citation omitted). In *Pension Benefit Guar. Corp. v. LTV Corp. (In re Chateaugay Corp.),* 87 B.R. 779, 796 (S.D.N.Y.1988), *aff'd,* 875 F.2d 1008 (1989), *rev'd on other grounds,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), District Judge Sweet reasoned as follows:

Consistent with the goals of uniform treatment for creditors and a fresh start for debtors, courts have determined when a claim arises for Code purposes by focusing upon "the time when the acts giving rise to the alleged liability were performed," since only reference to prepetition acts of the debtor will result in treating liabilities flowing from such acts in an equitable fashion.

(quoting *In re Johns–Manville Corp.,* 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986)).

Here, the Minimum Funding Claim springs from the creation of Debtor's Pension Plan in 1985. As of the petition date, Pension Trustee's claim for minimum funding contributions is the paradigmatic prepetition contingent claim. The postpetition termination of the Pension Plan, if and when it is terminated, does not transform this contingent claim into a postpetition claim worthy of an administrative priority.

■ When prepetition labor gives rise to postpetition pension funding claims, the resulting claims are prepetition debts. In *Pension Benefit Guar. Corp. v. LTV Corp.,* 875 F.2d 1008 (2d Cir.1989), *rev'd on other grounds,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), the Second Circuit opined that the applicable test requires a determination of when the acts that gave rise to LTV's obligations took place. *Id.* at 1017. In holding that PBGC's claims were prepetition debts, the Court concluded that the acts giving rise to LTV's pension debts were the prepetition labor of its employees, rather than the postpetition termination of the plan. *Id.* at 1019.

Similarly, the Second Circuit held that withdrawal liability payments were not entitled to an administrative priority because such payments were made to guarantee pension benefits already earned by the employees covered by the plan, and because the consideration supporting the withdrawal liability was the same as that supporting the pensions themselves, i.e., the past, prepetition labor of the employees. *Amalgamated Ins. Fund, supra,* 789 F.2d at 104; *In re Chateaugay, supra,* 115 B.R. at 777. Pension Trustee's arguments notwithstanding, the same argument applies to the triggering of claims for minimum funding contributions. To the extent that there is a distinction, it is a distinction without a difference for the purposes of determining when a claim arises. A minimum funding obligation, like withdrawal liability, is merely a substitution for the continuing contributions that the plan sponsor should have made prepetition to fund accrued benefits.

Following an analysis of this very issue in *In re Chateaugay,* Chief Bankruptcy Judge Lifland held that minimum funding requirements under ERISA were prepetition claims

to the extent they arose from or induced prepetition labor. *In re Chateaugay, supra,* 115 B.R. at 772–778. Only funding contributions due during the bankruptcy case itself that were attributable to the postpetition labor of LTV employees were considered to satisfy the first element of the *Mammoth Mart* test, namely, that the claim arose from a creditor's transactions with a debtor. The same can be said for the facts relevant here.

 For a claim to be administrative, the benefit must accrue to the estate itself. The benefit must also arise from a postpetition transaction with the debtor-in-possession or trustee. *See Mammoth Mart, supra,* 536 F.2d at 954. Postpetition minimum funding requirements arising under ERISA satisfy neither prong of the *Mammoth Mart* test because the requirements result from a prepetition agreement where payment became due postpetition. The relevant portion of the Minimum Funding Claim is therefore properly reclassified as a general unsecured claim.[24]

We next turn to PBGC's Unfunded Benefits Claim for the "total amount of unfunded benefit liabilities" of the Pension Plan. *See* ERISA § 4062(b), 29 U.S.C. § 1362(b) (1993). Pension Trustee seeks, in equity, an identical recovery (the "Deficiency Claim"). Pension Trustee estimates that Debtor owes $1,366,885 in unpaid contributions necessary to pay all plan liabilities and asset insufficiencies.

Liquidation Trustee argues that the Deficiency Claim and the Unfunded Benefits Claim are duplicative in two ways. First, both claims seek an identical recovery for an identical injury, i.e., the dollar amount necessary to satisfy all obligations arising under the Pension Plan and ERISA. Second, Liquidation Trustee argues that both the Unfunded Benefits Claim and the Deficiency Claim overlap amounts sought in the Minimum Funding Claim. To remedy the duplications, Liquidation Trustee urges us to (1) disallow PBGC's Unfunded Benefits Claim, and (2) reduce the amount of Pension Trustee's Deficiency claim by an amount equal to the Minimum Funding Claim.

 Pension Trustee and PBGC maintain that if either of their claims is reduced for duplicating amounts sought under the Minimum Funding Claim, we should credit any distribution made under the Minimum Funding Claim, in its actual dollar amount paid, to determine the ultimate asset insufficiency. According to this reasoning, we should subtract the prorated allowed amount of the Minimum Funding Claim paid in "tiny bankruptcy dollars," from the total asset deficiency, rather than subtract the Pension Trustee's allowed minimum funding obligation in bigger, prebankruptcy dollars.[25]

PBGC cites *In re CF & I Fabricators of Utah, Inc.,* 16 EBC 1364 (Bankr.D.Utah

24. We note that recent attempts to amend § 503(b) to include minimum funding contributions among the list of administrative priorities played no role in our decision. According to statements in the Congressional Record, the proposed changes seek to overturn rulings made in the LTV case. *See, e.g.,* 138 Cong.Rec. S8241–01, S8268 (daily ed. June 16, 1992) (statement of Sen. Graham). *See also* 139 Cong.Rec. S2610–02, S2613 (daily ed. March 3, 1993). Despite these legislative efforts, the LTV opinions remain the most thorough and thoughtful analyses available of the pension-related issues presented herein. *See, e.g., In re Chateaugay Corp., supra,* 115 B.R. 760. Indeed, to disregard such a valuable body of caselaw in favor of a possible legislative enactment would entrust the rule of law to a mere proposal not yet set for a vote, much less signed into law. For evidence of the mercurial nature of the legislative process, one need look no further than a more recent bill, i.e., The Bankruptcy Amendment Act of 1993, S.540, where the heightened priority of minimum fund-

ing claims is noticeably absent. The minimum funding issue may ultimately be addressed in amendments to the bill if it reaches the Senate floor, but any certainty in this regard would require omnipotence beyond ordinary clairvoyance. Therefore, despite PBGC's invitation to the contrary, we choose to follow well-reasoned case law "so that the symbol of our profession may remain the scales, not the seesaw." *Patterson v. Shumate,* — U.S. —, —, 112 S.Ct. 2242, 2251, 119 L.Ed.2d 519 (1992) (Scalia, J, concurring).

25. "Tiny bankruptcy dollars" refers to the postpetition, prorata distribution of estate assets to holders of allowed claims. *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687, 709 (Bankr. S.D.N.Y.1992), *citing,* Westbrook, A Functional Analysis of Executory Contracts, 74 Minn.L.Rev. 227, 335–336 (1989). In the vast majority of bankruptcy cases, the pro rata distribution is considerably less than the claim amount.

1992), in support of its argument that claims for minimum funding contributions and unfunded benefit liabilities are nonduplicative and consistent with ERISA's statutory mandate. *CF & I* held, in part, that PBGC need only reduce its unfunded benefit claims by the "probable recovery" on its minimum funding claims, rather than by the total allowed amount of the minimum funding claims. *Id.* at 1373 ("giving the PBGC credit for the probable value of the [m]inimum [c]ontribution [c]laims, a plan asset, as opposed to the dollar amount of the claim, provides the correct determination of the total [u]nfunded [b]enefit [c]laims.") Unfortunately, the court provided no rationale for its decision. It is therefore improbable that PBGC could articulate with any certainty why the court ruled as it did.

▉▉▉▉ The position of PBGC and Pension Trustee is, however, entirely at odds with fundamental bankruptcy policy favoring equality of distribution among similarly situated creditors. In bankruptcy, multiple recoveries for an identical injury are generally disallowed. *See In re Chateaugay, supra,* 115 B.R. at 783–784, *aff'd,* 130 B.R. 690, 698 (S.D.N.Y.1991) ("[t]o allow one creditor to assert two dollars in claims for every one dollar of loss from the same debtor violates principles of ratable distribution and offends notions of uniform treatment for creditors.")

A simple example reveals the inequity of Pension Trustee's and PBGC's positions. If, for the purposes of example only, the minimum funding requirement is $500,000 and the asset insufficiency is $1,000,000, then assuming a distribution of thirty cents on the dollar, the estate will pay $150,000 in actual dollars to satisfy the minimum funding obli-

gation.[26] PBGC and Pension Trustee maintain that they can assert an unsecured claim for $350,000 in addition to their $1,000,000 asset insufficiency claim. PBGC and Pension Trustee therefore seek to be paid thirty cents on the dollar for $500,000, plus an additional thirty cents on the dollar for the remaining $350,000. Debtor's estate would then be liable for $255,000 on a $500,000 claim, even though the rate of distribution for creditors is thirty cents on the dollar. We find such a result inconsistent with the letter and spirit of Title 11.

Pension Trustee's Deficiency Claim is therefore disallowed to the extent that Pension Trustee's Deficiency claim duplicates PBGC's Unfunded Benefits Claim. Additionally, PBGC's Deficiency Claim will be offset by the allowed amount of the Pension Trustee's Minimum Funding Claim. The amount of the setoff, to the extent that it remains in dispute, will be resolved at trial if necessary.

We next address Pension Trustee's cross motion to impose a constructive trust on prepetition payments made to Debtor's partners following termination of their IDBs. At the time of termination, Debtor's IDBs held assets in excess of liabilities in the range of $1.8 million. By comparison, Debtor's Pension Plan for nonattorney employees was allegedly underfunded by fifty percent.[27] It is undisputed that Debtor retained a reversionary interest in any surpluses generated from termination of the IDBs.[28] Pension Trustee argues that any surplus in the IDBs should have been used to fund Debtor's Pension Plan for its nonattorney employees and that the partners received their distributions in violation of 26 U.S.C. § 401(a)(4).[29]

---

**26.** The $500,000 minimum funding requirement is part of the total $1,000,000 asset insufficiency. Subtracting the duplicative minimum funding claim, the remaining $500,000 is multiplied by 0.30 to reach the total claim amount paid by the estate.

**27.** *See* Supplemental Memorandum of PBGC in Opposition to the Liquidation Trustee's Motion For Summary Judgment, dated April 30, 1993, p. 10.

**28.** *See* Liquidation Trustee's Statement Pursuant to Local Bankruptcy Rule 13(h), Undisputed Facts Relative to the Pension Trustee's Cross Motion, ¶ 16, dated September 14, 1992.

**29.** Section 401(a) of Title 26, as amended in 1986, provides in pertinent part:

Qualified pension, profit sharing, and stock bonus plans
(a) Requirements for qualification. A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

. . . . .

(4) if the contributions or benefits provided under the plan do not discriminate in favor of

In response, Liquidation Trustee argues that the surpluses increased each partner's contribution to the Partner Settlement Trust from which Debtor has paid and will pay allowed claims, and that Pension Trustee's constructive trust claim belies the fundamental bankruptcy policy of ratable distribution.

Judge Cardozo defined a constructive trust as

> the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

*Brand v. Brand,* 811 F.2d 74, 77 (2d Cir. 1987), *quoting Simonds v. Simonds,* 45 N.Y.2d 233, 241, 380 N.E.2d 189, 193, 408 N.Y.S.2d 359, 363 (1978), *quoting Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378 (1919). Under New York law, a party claiming entitlement to a constructive trust must ordinarily satisfy four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment. *Koreag, Controle et Revision S.A. v. Refco F/X Assocs, Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 352 (2d Cir.1992) (citations omitted). *See Kelly v. Religa (In re Religa),* 157 B.R. 54, 61 (Bankr.W.D.N.Y. 1993).

New York courts, as well as federal courts applying New York law, construe the elements of a constructive trust with considerable flexibility, and it is generally held that the doctrine may be invoked to prevent unjust enrichment in a wide range of circumstances. *Koreag, supra,* 961 F.2d at 353 ("[t]he doctrine's applicability is limited only by the inventiveness of men who find new

ways to enrich themselves unjustly by grasping what should not belong to them.") (citations and quotations omitted). *See, e.g., Palazzo v. Palazzo,* 121 A.D.2d 261, 264, 503 N.Y.S.2d 381, 383–384 (1st Dep't 1986); *E.W. Lines v. Bank of Am. Nat'l Trust and Sav. Ass'n,* 743 F.Supp. 176, 179–180 (S.D.N.Y. 1990).

Our ability to impose a constructive trust on disproportionate pension benefits paid to Debtor's partners is limited by statute. ERISA § 206(d)(1) requires that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1) (1993).

In *Guidry v. Sheet Metal Workers Pension Fund,* 493 U.S. 365, 376, 110 S.Ct. 680, 687, 107 L.Ed.2d 782 (1990), the Supreme Court held that no generalized equitable exception exists to limit ERISA's prohibition on the assignment or alienation of pension benefits. ("[W]e think it [in]appropriate to approve any generalized equitable exception—either for employee malfeasance or for criminal misconduct—to ERISA's prohibition on the assignment or alienation of pension benefits.") Writing for the majority, Justice Blackmun opined that "[courts may not] announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text." *Id.* The Court also discussed the purpose of ERISA § 206(d):

> [§] 206(d) reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task.

highly compensated employees (within the meaning of section 414(q)) . . .

We note that 26 U.S.C. § 401(a)(4) confers no substantive rights that Pension Trustee may enforce. *See, e.g., Reklau v. Merchants Nat'l Corp.,* 808 F.2d 628, 631 (7th Cir.1986), *cert. denied,* 481 U.S. 1049, 107 S.Ct. 2180, 95 L.Ed.2d 836 (1987) (I.R.C. § 401 creates no substantive rights); *Cowan v. Keystone Employee Profit Sharing Fund,* 586 F.2d 888, 890 n. 3 (1st Cir.1978) ("[I.R.C. § 401] does not appear to create any

substantive rights that a beneficiary of a qualified retirement trust can enforce"); *Wiesner v. Romo Paper Products Corp. Employees' Retirement Plan,* 514 F.Supp. 289, 291 n. 2 (E.D.N.Y.1981) ("[§ 401 does] not create a substantive right that a beneficiary, participant, or fiduciary could enforce"). Similarly, § 401(a)(4) creates no substantive rights under ERISA that can be enforced in a private cause of action. *Reklau, supra,* 808 F.2d at 631 (citations omitted).

*Id.* After noting the occasion of "natural distaste" for its decision, the Court reversed the lower courts' imposition of a constructive trust on pension benefits paid to a convicted embezzler, even though another federal statute arguably permitted the relief sought under some circumstances. *Id.,* 493 U.S. at 374, 110 S.Ct. at 686. *See* Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 501(c) (1982). The Court noted that in yet another statute involving a similar anti-alienation provision, Congress expressly provided that the restriction would not apply to a "qualified domestic relations order." *Id.* 493 U.S. at 376 n. 18, 110 S.Ct. at 687 n. 18, *quoting* the Retirement Equity Act of 1984, § 104(a), 29 U.S.C. § 1056(d)(3) (1982). Without a similar clarification in ERISA, the Court concluded that Congress intended § 206 to protect the flow of pension benefits to plan participants "over the desire to do equity between particular parties." *Id.,* 493 U.S. at 376, 110 S.Ct. at 687.

The Supreme Court applied similar reasoning in *Patterson v. Shumate,* —— U.S. ——, —— – ——, 112 S.Ct. 2242, 2246–48, 119 L.Ed.2d 519, holding that ERISA's anti-alienation protection excludes a debtor's pension benefits from the bankruptcy estate. The Court, citing the numerous policy concerns underlying ERISA, reiterated its refusal to create equitable exceptions to the anti-alienation clause.

ERISA's anti-alienation provision, however, does not prevent us from entertaining the equitable relief that Pension Trustee requests. In *Guidry,* the Supreme Court noted that the facts before it did not involve a defendant pensioner found to have breached a fiduciary duty to a pension plan. *Guidry, supra,* 493 U.S. at 373, 110 S.Ct. at 685. The Court expressly declined to decide the issue whether remedies for breach of fiduciary duty under ERISA § 409(a) provided a statutory exception to ERISA's anti-alienation provision. *Id.* at 373, 110 S.Ct. at 685. ("[w]e need not decide whether the remedial provisions contained in § 409(a) supersede the bar on alienation in § 206(d)(1), since [Guidry] has not been found to have breached any fiduciary duty *to the pension plans* ") (italics in original).

The issue avoided in *Guidry* is squarely before us in Pension Trustee's cross motion. Pension Trustee alleges that Debtor paid IDB surpluses in violation of fiduciary duties it owed to the Pension Plan. *See* 29 U.S.C. § 1104 (1993). Under ERISA § 409(a), a faithless plan fiduciary is "personally liable to make good to such plan any losses to the plan resulting from such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a) (1993). Similarly, ERISA § 502(a) authorizes the Secretary of Labor, plan participants, beneficiaries, and fiduciaries to bring civil actions "for appropriate relief under section [409]" or to obtain an injunction or "other appropriate relief" for violations of ERISA's fiduciary duty provisions. 29 U.S.C. § 1132(a) (1993).

From our reading of ERISA, the remedial provisions provided in § 409(a) for fiduciary breach supersede and override the bar on alienation found in § 206(d)(1). Several courts have reached the same conclusion. In *Coar v. Kazimir,* 990 F.2d 1413, 1415 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 179, 126 L.Ed.2d 138 (1993), the Third Circuit held that § 409 permits equitable remedies notwithstanding ERISA's anti-alienation provision. According to the Court,

[g]iven [§] 409(a)'s express mandate that trustees undo any harm they have done to the pension plan, and the absence of any language in [§] 206(d)(1) or its legislative history limiting the range of options granted to the courts under ERISA to see that this is done, we do not believe that Congress intended the anti-alienation provision to dilute the potential relief available to pension beneficiaries. Instead, we read [§] 206(d)(1) and, by extension *Guidry,* as shielding only the beneficiaries' interest under the pension plan from third-party creditors.

*Id.* at 1420–1421. The Court concluded that § 409(a) permits courts to fashion equitable remedies for breach of fiduciary duty, regardless of ERISA's anti-alienation provision, when such fiduciary duty claims are brought by or on behalf of plan beneficiaries rather than by third party creditors.

Similarly, in *Pension Benefit Guar. Corp. v. Solmsen*, 743 F.Supp. 125, 129 (E.D.N.Y. 1990), the court held that the remedy of setoff in fiduciary breach cases is a narrow exception to the anti-alienation provision. *Reich v. Davidson Lumber Sales, Inc.*, 154 B.R. 324, 337 (Bankr.D.Utah 1993) reaches a like result. ("[g]iven the express language of ERISA section 409(a) that pension plan fiduciaries are required to 'make good' to the plan any losses caused by the breaches of their fiduciary duties to the plan, and the lack of any indication in the language of ERISA section 206(d)(1) or its legislative history that section 206(d)(1) was intended to limit section 409, this court holds that section 409(a) provides an exception to section 206(d)(1)"). *Contra, Herberger v. Shanbaum*, 897 F.2d 801, 804 (5th Cir.1990), *cert. denied*, 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990) (language in ERISA § 409 not expansive enough to overrule anti-alienation provision).

 In light of the above authorities, we hold that Pension Trustee's cross claim alleges facts of fiduciary breach sufficient to state a claim for equitable relief as permitted under ERISA § 409(a).[30] Because numerous material facts remain in dispute, the cross claim cannot be resolved on a motion for summary judgment. Liquidation Trustee's motion for summary judgment is therefore denied.

---

**30.** To hold otherwise would render courts powerless to enforce ERISA's mandate, a result that belies the language of § 409(a). ("[a]ny person who is a fiduciary ... shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate"). Section 409(a) shows that Congress was unwilling to give plan fiduciaries carte blanche in their payment of plan benefits. Without the enforcement powers granted under § 409(a), we are confident that an overly broad construction of § 206(d)(1) would, in Shakespearean idiom,

> make a scarecrow of the law,
> Setting it up to [frighten] the birds of prey,
> And let it keep one shape, till custom make it
> Their perch and not their terror.

*Measure for Measure* act 2, sc. 1, line 1–4.

**31.** The three vacated decisions are reported at *LTV, Corp. v. Pension Benefit Guaranty Corp. (In re Chateaugay)*, 115 B.R. 760 (Bankr.S.D.N.Y. 1990); *LTV Corp. v. Pension Benefit Guaranty*

Finally, we turn to the vacatur issue raised in a series of letters following oral argument on the motion for summary judgment. On June 21, 1993, District Judge Duffy signed a settlement order that, in relevant part, vacated three decisions rendered in the LTV case.[31] The LTV Settlement Order states that the LTV lower court decisions "have been vacated and withdrawn, shall be of no force and effect, and shall have no precedential value."

 In *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–40, 71 S.Ct. 104, 106–107, 95 L.Ed. 36 (1950), the Supreme Court held that judgments may be vacated when disputes become moot under circumstances beyond the control of the parties. ("[The] established practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with direction to dismiss."); *See Deakins v. Monaghan*, 484 U.S. 193, 200, 108 S.Ct. 523, 528, 98 L.Ed.2d 529 (1988); *Duke Power Co. v. Greenwood County*, 299 U.S. 259, 267, 57 S.Ct. 202, 205; 81 L.Ed. 178 (1936). Several Circuits, including our own, have extended the holding in *Munsingwear* to cases involving "voluntary" mootness,[32] i.e., when litigants agree to settle and vacate a lower court judgment pending appeal.[33] According to the Second Circuit,

---

*Corp., (In re Chateaugay)*, 126 B.R. 165 (Bankr. S.D.N.Y.1991) (both by Chief Bankruptcy Judge Lifland); and *LTV, Corp. v. Pension Benefit Guaranty Corp. (In re Chateaugay)*, 130 B.R. 690 (S.D.N.Y.1991) (by District Judge Duffy).

**32.** Mootness is a jurisdictional principle relating to Article III's requirement that federal courts hear only "cases" or "controversies." The Supreme Court distinguishes between cases that become moot by "happenstance," unattributable to any of the parties, *Munsingwear, supra*, 340 U.S. at 40, 71 S.Ct. at 107, and those in which the losing party declines to pursue an appeal. Only in the first instance is the case truly moot. *Id.; Blackwelder v. Safnauer*, 866 F.2d 548, 550–51 (2d Cir.1989).

**33.** The Circuits are sharply divided over the propriety of vacatur. As of this writing, three well-defined schools of thought have emerged. *See Benavides v. Jackson Nat'l Life Ins. Co.*, 820 F.Supp. 1284 (D.Colo.1993) (discusses policies

authority for this extension rests in the court's sound discretion under Fed.R.Civ.P. 60(b)(5) and (6).[34] The Supreme Court recently granted certiorari to determine whether courts may vacate judgments in furtherance of settlement. *See U.S. Philips Corp. v. Windmere Corp., supra.*

PBGC argues that the three vacated LTV decisions, regardless of their analytical value, have no weight as either persuasive or binding precedent and that to preserve the precedential value of the decisions would be inconsistent with Second Circuit law, which strongly promotes settlement. *See Nestle Co. v. Chester's Mkt., Inc., supra,* 756 F.2d at 283. *See also Reich v. Contractors Welding of Western New York, Inc.,* 996 F.2d 1409 (2d Cir.1993).

■■■■■ Although PBGC correctly states that vacatur is freely allowed in the Second Circuit, *see Nestle, supra,* PBGC incorrectly concludes that the *Nestle* rule is outcome-determinative here. First, even if the LTV decisions had not been vacated, their weight as precedent is merely persuasive, because we are not bound by one bankruptcy judge's or one district court judge's decision in a multi-judge district. *Pereira v. Centel Corp.* *(In re Argo Communications Corp.),* 134 B.R. 776, 786–87 n. 9 (Bankr.S.D.N.Y.1991); *See In re Shattuc Cable Corp.,* 138 B.R. 557, 565–67 (Bankr.N.D.Ill.1992) (discusses strong trend in recognition of nonbinding nature of district court and bankruptcy court opinions in multi-judge districts). A bankruptcy judge, like a district court judge, is free to reexamine an issue despite the existence of a prior decision of another judge in the same district unless, by chance or otherwise, all judges in his or her district have ruled consistently on the same issue, or the Circuit or Supreme Court has so held. Moreover, a logical and well-reasoned decision, despite vacatur, is always persuasive authority, regardless of its district or circuit of origin or its ability to bind. Chief Bankruptcy Judge Lifland's LTV decisions fall into this latter category. *See. e.g., In re Chateaugay, supra,* 115 B.R. 760.

## CONCLUSION

1. Pension Trustee's prepetition contingent claim for minimum funding contributions and premiums is a general unsecured claim except to the extent that Pension Trustee can prove, by a preponderance of the evidence, that the necessary funding contri-

both for and against vacatur). The Second Circuit advocates virtually unlimited vacatur, citing both the importance of settlement and the conservation of judicial resources. *See, e.g., Long Island Lighting Co. v. Cuomo,* 888 F.2d 230, 234 (2d Cir.1989); *Nestle Co. v. Chester's Market, Inc.,* 756 F.2d 280 (2d Cir.1985). According to the Third, Seventh, and District of Columbia Circuits, requests for vacatur based on post-judgment settlement should be refused. *See Clarendon Ltd. v. Nu–West Indus., Inc.,* 936 F.2d 127 (3rd Cir.1991); *In re Memorial Hosp.,* 862 F.2d 1299, 1303 (7th Cir.1988); *In re United States,* 927 F.2d 626 (D.C.Cir.1991). The Federal Circuit holds that although vacatur is not "automatic under all circumstances," vacatur of earlier judgments is generally allowed. *U.S. Philips Corp. v. Windmere,* 971 F.2d 728, 731 (Fed.Cir.1992), *cert. granted sub nom., Kaisha v. U.S. Philips Corp.,* — U.S. ——, 113 S.Ct. 1249, 122 L.Ed.2d 649 (1993). The Ninth Circuit supports neither position, instead choosing to follow a balancing approach that distinguishes between cases rendered moot by circumstances beyond the control of the parties and those rendered moot by choice. *See, e.g., Scott v. Iron Workers Local 118, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, AFL–CIO,* 928 F.2d 863 (9th Cir.1991).

While arguably promoting settlement and conservation of judicial resources, vacatur may be abused by institutional litigators eager to manipulate certain bodies of caselaw. *See,* Fisch, Rewriting History: The Propriety of Eradicating Prior Decisional Law Through Settlement and Vacatur, 76 Cornell.L.Rev. 589 (March 1991). Vacatur may also waste judicial resources and ultimately delay settlement because parties may be less inclined to settle during pretrial stages if the parties know that they can vacate the trial judgment at a later date.

**34.** *See Nestle Co. v. Chester's Mkt., Inc.,* 596 F.Supp. 1445, 1449–50, *rev'd on other grounds,* 756 F.2d 280 (2d Cir.1985). The Second Circuit limited its inquiry in *Nestle* to a review of the district court's "discretion" in denying the request for vacatur. *Id.,* 756 F.2d at 282. Fed. R.Civ.P. 60(b) provides that a court

may relieve a party ... from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

butions pertained to and encouraged postpetition labor by Debtor's employees. Partial summary judgment is granted in favor of Liquidation Trustee.

2. PBGC's claim for underfunded benefit liabilities is reduced, dollar for dollar, in an amount equal to Pension Trustee's Deficiency Claim. The Deficiency Claim is subject to setoff equal to the allowed amount of the Minimum Funding Claim. The amount of offset is equal to the claim amount, not the claim's present value. Summary judgment is granted to Liquidation Trustee.

3. Pension Trustee's cross motion for a constructive trust alleges facts sufficient to state a claim under ERISA § 409(a) for breach of fiduciary duty. Liquidation Trustee's motion for summary judgment is denied.

The parties shall settle an order on five days notice consistent with this Memorandum of Decision.