In re CF & I FABRICATORS OF UTAH, INC., et al., Reorganized Debtors.

PENSION BENEFIT GUARANTY CORPORATION, Plaintiff,

v.

REORGANIZED CF & I FABRICATORS OF UTAH, INC., et al.; and United AFL–CIO–CLC, Defendants.

No. 93–C–744B.

United States District Court,
D. Utah,
Central Division.

Nov. 18, 1994.

Carol Connor Flowe, William Beyer, Israel Goldowitz, Steven A. Weiss, Garth Wilson, Susan E. Birenbaum, Marc A. Tenenbaum, Washington, DC, Robert D. Merrill, William G. Fowler, Salt Lake City, UT, Charles G. Cole, Washington, DC, Weston L. Harris, Salt Lake City, UT, Richard M. Seltzer, Ann O'Shea, New York City, Paul James Toscano, Salt Lake City, UT, for plaintiff.

Frank Cummings, Steven T. Waterman, Edward A. Scallet, Eunice Lin Bumgardner, Steven J. McCardell, Lon A. Jenkins, Cindy Steel Jenks, Salt Lake City, UT, Joseph E. O'Leary, Scott A. Faust, Boston, MA, Richard M. Seltzer, Ann·O'Shea, New York City, Richard Brook, for defendants.

## OPINION

BENSON, District Judge.

This bankruptcy appeal came before the Court on Wednesday, October 26, 1994. Susan E. Birenbaum, Israel Goldowitz, Garth D. Wilson, Marc A. Tenenbaum, and William G. Fowler represented the appellant and cross-appellee, Pension Benefit Guaranty Corporation ("PBGC"). Frank Cummings, Scott A. Faust, Steven J. McCardell, and Steven T. Waterman represented appellees and cross-appellants Reorganized CF & I Fabricators of Utah, Inc., *et al.* ("Debtors" or "Reorganized Debtors"). Richard M. Seltzer and Richard Brook represented appellee and cross-appellant United Steelworkers of America, AFL–CIO–CLC ("United Steelworkers").

## BACKGROUND

This appeal and cross-appeal concern liabilities arising from the pension plan ("the Plan") administered by the Reorganized Debtors prior to their filing of chapter 11 petitions. The Plan obligated the Reorganized Debtors to pay fixed pension benefits calculated according to the pay and years of service of each recipient former employee. The Employee Retirement Income Security Act ("ERISA") required the Reorganized Debtors to make annual funding contributions to PBGC based on the actuarial valuation of the benefits the employees earned. PBGC is a corporation owned by the federal government that was established under ERISA to administer pension plan termination and to guarantee payment of certain benefits under terminated pension plans. 29 U.S.C. § 1302 (1985 & Supp.1994). PBGC obtains funding for its administrative expenses and benefit payments by collecting minimum funding contributions from pension plans, generating investment income, allocating the assets of terminated plans, and recovering on its claims against the administrators of terminated plans. PBGC does not receive general federal revenue. The claims under which PBGC can recover include those for (1) unpaid minimum funding contributions and (2) the amount by which PBGC's benefit payments exceed the value of the Plan's assets at termination (known as "unfunded benefit liabilities").

The Reorganized Debtors failed to make the minimum funding contribution due on September 15, 1990. The Reorganized Debtors filed petitions for reorganization under chapter 11 on November 7, 1990. At the time of filing, the Plan was underfunded by about $200 million. The Reorganized Debtors maintained control over the Plan for about another year but failed to make the minimum funding contributions. On March 19, 1992, PBGC terminated the Plan, and PBGC became the Plan's trustee. PBGC began making payments to beneficiaries of the Plan.

PBGC asserted claims in the bankruptcy court for approximately $71 million in unpaid minimum funding contributions and for approximately $222 million for unfunded benefit liabilities. PBGC argued that its claims were entitled to priority under ERISA and the Internal Revenue Code ("I.R.C.").

In decisions dated November 9, 1992 and December 31, 1992, the bankruptcy court denied PBGC's claim of tax priority on all but a small portion of the amount it sought. Specifically, the decisions included the following holdings that are relevant to this appeal:

● PBGC's claims for unpaid mandatory contributions are not entitled to administrative expense priority under 11 U.S.C. § 503(b)(1)(B) or tax priority pursuant to 11

U.S.C. § 507(a)(7) because the automatic stay precluded the imposition of a lien.

• PBGC's claims for minimum funding contributions arose prepetition because the acts giving rise to the Debtors' liability to make those contributions occurred pre-petition.

• PBGC's claims for minimum funding contributions are not entitled to post-petition interest as administrative claims because those contributions were not actual and necessary expenses of preserving the Debtors' estates.

• PBGC's claim for a $3 million portion of the unfunded benefit liabilities is not entitled to tax priority because the termination of the Plan occurred post-petition, and the automatic stay precluded the imposition of the lien provided for by ERISA section 4068(c)(2), 29 U.S.C. § 1368(c)(2).

• PBGC is not entitled to interest on its claims for minimum funding contributions because those contributions are not post-petition taxes and because administrative expenses are not entitled to interest.

The bankruptcy court's decisions also included the following holdings that are relevant to the cross-appeal:

• PBGC's determination of the valuation of its claims is entitled to deference, and that determination is entitled to "substantial weight" when the court determines whether to allow claims.

• PBGC's claim for minimum funding contributions is disallowed to the extent that it duplicates PBGC's claim for unfunded benefit liabilities.

• Each of the Debtors is jointly and severally liable under ERISA § 4062(a), 29 U.S.C. § 1362(a).

Following the bankruptcy court's decision, the Debtors emerged from bankruptcy pursuant to a consensual reorganization plan. That plan established reserve funds for the purpose of funding PBGC's recovery in the event it prevails on this appeal. Only those reserve funds will be affected by the outcome of this appeal. PBGC estimates that its losses resulting from the termination of the Plan will be approximately $250 million.

## ISSUES ON APPEAL

I. Tax Priority Status of Claim for Minimum Funding Contributions

■ PBGC argues that the bankruptcy court erred in concluding that its claims for unpaid mandatory contributions are not entitled to administrative expense priority under 11 U.S.C. § 503(b)(1)(B) or tax priority pursuant to 11 U.S.C. § 507(a)(7). The bankruptcy court found that, although ERISA and the I.R.C. provide for a lien to be automatically imposed 60 days after the amount of unpaid contributions exceeds $1,000,000, the operation of the Bankruptcy Code's automatic stay precluded the imposition of such a lien in this case.

PBGC asserts that I.R.C. § 412(n) does not require perfection of a lien before the amount thereof is entitled to tax priority. According to PBGC, Congress intended to give first priority not to perfected liens (which are entitled to priority under the Bankruptcy Code), but rather to the *amount* of liens that could arise. PBGC further argues that the lien at issue was imposed by operation of statute when the pension plan was established and therefore existed prepetition. The Reorganized Debtors and the United Steelworkers, on the other hand, argue that the bankruptcy court followed the clear language of I.R.C. § 412(n), that priority is given to the "amount with respect to which a lien is imposed," when it held that the imposition of the lien was blocked by the automatic stay.

ERISA and the I.R.C. provide for a lien that arises on the 60th day after an employer falls more than $1 million behind in making its minimum funding contributions. I.R.C. § 412(n); 29 U.S.C. § 1082(f) (Supp.1994). ERISA and the I.R.C. further provide that the "amount with respect to which a lien is imposed ... shall be treated as taxes due and owing the United States." ERISA § 302(f), 29 U.S.C. § 1082(f)(4)(C) (Supp. 1994); I.R.C. § 412(n)(4)(C), 26 U.S.C. § 412(n)(4)(C) (1985). The Bankruptcy Code gives first priority to certain taxes as administrative expenses under 11 U.S.C. § 503(b)(1)(B), and seventh priority to cer-

tain other taxes pursuant to 11 U.S.C. § 507(a)(7).

The priority provided by these statutes, as the bankruptcy court held, never arose in this case due to the operation of the automatic stay. The automatic stay precludes "any act to create, perfect, or enforce any lien against property of the estate" and "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(4), (5) (1993). The bankruptcy court followed the clear language of I.R.C. § 412(n) and 29 U.S.C. § 1082(f) when ruling that liens arise 60 days after the day that the unpaid contributions amount to $1 million and when determining that tax priority is given only to liens, not to the amount of claims that never become liens.

## II. Timing of Minimum Funding Contributions

■ PBGC argues that the bankruptcy court erred in holding that PBGC's claims for minimum funding contributions arose pre-petition rather than when the quarterly payments became due. The bankruptcy court held that the transaction giving rise to the Debtors' liability for contributions was the pre-petition labor of the Debtors' employees. PBGC argues that the unpaid contributions that came due post-petition should be given first priority as post-petition taxes, and that the contributions Debtors failed to make pre-petition are entitled to seventh priority as pre-petition taxes.

The bankruptcy court correctly analyzed the Reorganized Debtors' liability by examining the time at which the consideration for that liability occurred. In this case, the acts that gave rise to the Debtors' liability to pay mandatory contributions to PBGC is the performance of labor by the Debtors' employees. *LTV Corp. v. Pension Benefit Guaranty Corp. (In re Chateaugay Corp.)*, 115 B.R. 760, 772–78 (Bankr.S.D.N.Y.1990). Because the performance of labor occurred pre-petition, the liability to PBGC arose pre-petition.

## III. Administrative Expense Priority Status for Minimum Funding Contribution Claims

■ PBGC asserts, as an alternative to the argument that its claims for minimum funding contributions are entitled to tax priority, that $37,680,574 of those unpaid contributions are entitled to administrative expense priority. The Reorganized Debtors and the United Steelworkers argue that the bankruptcy court correctly determined that those claims were not administrative because minimum funding contributions did not benefit the Reorganized Debtors.

On appeal, PBGC argues that contributions to pension plans qualify as administrative expenses because they are a "cost of doing business" during a reorganization. PBGC relies on Section 507(a)(1) of the Bankruptcy Code, which defines administrative expenses as "including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 507(a)(1) (1993). According to PBGC, the list in Section 507(a)(1) is not exclusive due to the word "including." PBGC also contends that the costs of compliance with regulatory schemes qualify as administrative expenses.

The Tenth Circuit has established the following two-part test for determining which claims qualify as administrative expenses:

> an expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession and only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.

*In re Amarex, Inc.*, 853 F.2d 1526, 1530 (10th Cir.1988). This is the test the bankruptcy court applied below. The bankruptcy court correctly ruled on the basis of this test that the claims arising from the Reorganized Debtors' failure to pay pre-petition mandatory contributions are not entitled to priority as administrative expenses. Although the payment of minimum funding contributions may create some good will among employees, making those payments is not "beneficial to the debtor-in-possession in the operation of the business" as that language has been in-

terpreted in the relevant case law. Furthermore, the payments arise out of a transaction between the employees and the Reorganized Debtors rather than a "transaction between the creditor and the bankrupt's trustee or debtor in possession."

## IV. Post–Petition Interest on Minimum Funding Contribution Claim

■ PBGC argues below that, because its claim for unpaid mandatory contributions is entitled to tax priority, PBGC is also entitled to interest on the amount of that claim. The bankruptcy court denied post-petition interest on those claims.

On appeal, PBGC asserts that it is "well settled" that interest on post-petition taxes is entitled to administrative priority. The Reorganized Debtors and the United Steelworkers argue that PBGC is not entitled to interest on its mandatory contributions claim because (1) those claims do not qualify for tax priority; (2) administrative expense claims are not entitled to interest; and (3) unsecured creditors are not entitled to interest unless the debtors are solvent.

This issue is related to the question whether PBGC's claims for minimum funding contributions are entitled to tax or administrative expense priority. Consistent with this Court's denial of PBGC's claim for tax or administrative priority, this Court also upholds the bankruptcy court's denial of interest on those claims.

## V. Tax Priority Claim for Unfunded Benefit Liabilities

■ PBGC contends that the bankruptcy court erroneously denied tax-priority status to its $3 million claim for unfunded benefit liabilities. The tax-priority status of that claim, according to PBGC, derives from a statutory lien that attaches to all property rights held by the Debtors. The amount of that lien cannot exceed one-third of the Debtors' collective net worth. PBGC asserts that the unfunded benefit liabilities in this case amount to $222,866,000. Due to the statutory limitations, PBGC seeks a priority claim

of only $3 million, or about one-third of the Debtors' estimated collective net worth of about $10 million.[1]

The bankruptcy court held that PBGC's $3 million claim is not entitled to tax priority because the termination of the Plan occurred post-petition, and the automatic stay precluded the imposition of the lien provided for by ERISA section 4068(c)(2), 29 U.S.C. § 1368(c)(2). According to PBGC, the bankruptcy court erroneously failed to follow the proposition that "the portion of the liability ... to which the lien pertained was *itself* a tax, entitled to priority in bankruptcy." Tax priority is not preconditioned on the attachment or perfection of a lien, according to PBGC. PBGC asserts that Congress' capping of the lien at 30 percent of the Debtors' net worth shows that Congress took into consideration the burden that creating a priority in favor of PBGC would have on other creditors.

The bankruptcy court was correct, as the Reorganized Debtors and the United Steelworkers urge, in holding that tax priority arises only as to those unfunded benefit liabilities to which a lien is imposed, and that the automatic stay precluded the creation of the statutory lien. Like claims for minimum funding contributions, claims for unfunded benefit liabilities are entitled to tax priority only to the extent that a lien for the amount of those claims arises. As to PBGC's congressional intent argument, the better reasoned position is that Congress exhibited its intent to deny tax-priority status to those liabilities to which no liens are imposed by specifically providing tax-priority status to unfunded benefit liabilities to which liens are imposed.

## ISSUES ON CROSS–APPEAL

### I. Discount Rate

On cross-appeal, the Reorganized Debtors and the United Steelworkers contest the bankruptcy court's deference to PBGC's determination of the method and discount rate to be applied to the unfunded benefit liabili-

---

**1.** PBGC concedes that is has only an unsecured claim for the balance of the unfunded benefit liabilities.

ties claim. The cross-appellees claim that the bankruptcy court not only is statutorily required to determine the applicable discount rate in this instance, but also had no need to defer to the agency's expertise because the bankruptcy court often makes such determinations. Furthermore, the cross-appellees maintain that allowing PBGC to self-select an artificially low discount rate unjustifiably inflates PBGC's recovery to the detriment of other unsecured creditors. The Reorganized Debtors and the United Steelworkers assert that the bankruptcy court should not have based its decision on ERISA's policy goals, but should have employed fundamental bankruptcy principles and adopted a prudent investor method.

PBGC maintains that the unfunded benefit liabilities claim should be calculated according to PBGC's valuation as authorized by ERISA in 29 U.S.C. § 1301(a)(18). PBGC asserts that, because Congress did not expressly define the actuarial present value of the guaranteed benefits, Congress defers to agency interpretation unless that interpretation is arbitrary and capricious based on the Supreme Court's ruling in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). PBGC proposed a method of valuation which replicates the market price for insurance company close-out annuities for terminated pension plans, and the bankruptcy court accorded PBGC's determination of the method and discount rate "due deference" and "substantial weight" and found that no unfair or unreasonable advantage existed in favor of PBGC.

Neither bankruptcy law nor ERISA expressly states whether the bankruptcy court or PBGC has ultimate responsibility to determine the actuarial present value of guaranteed benefits in the reorganization context. Nevertheless, principles of statutory interpretation place that responsibility on the bankruptcy court. It is undisputed that both ERISA and the Bankruptcy Code authorize PBGC and the bankruptcy court to determine the discount rate related to pension termination liability. 29 U.S.C. § 1301(a)(18) (Supp.1994); 11 U.S.C. § 502(b) (1993); *see also In re Chateaugay Corp.,* 115 B.R. 760,

766 (Bankr.S.D.N.Y.1990), *vacated by consent of the parties,* 17 Employee Benefits Cas. (BNA) 1102, 1993 WL 388809 (S.D.N.Y. 1993). PBGC asserts that because Congress has not spoken to the precise issue, the court must give deference to the agency's interpretation based on agency expertise. However, the bankruptcy court also has vast experience in determining the present value of future payments, if not the precise valuation issue presented here. *See, e.g., In re Hardzog,* 901 F.2d 858 (10th Cir.1990) (determining present value of future cash flows in Bankruptcy Chapter 12 context); *In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d 1503 (9th Cir.1987) (fixing present value of federal tax claims in Chapter 11 reorganization).

 It is well established that where ERISA conflicts with another provision of federal law, ERISA must be subordinated. ERISA explicitly states that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States ... or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d) (1985). In the instant case, ERISA and the Bankruptcy Code conflict. Both PBGC and the bankruptcy court are authorized to make valuations of the claims. However, the bankruptcy court has an additional mandate to advance the principle of equality of treatment between similarly situated creditors. 11 U.S.C. § 1123(a)(4) (1993). Thus, ERISA must be subordinated to the Bankruptcy Code, and the present value calculations relating to pension termination liability must be determined according to bankruptcy law. The bankruptcy court applied the wrong standard of review in giving deference to PBGC's interpretation.

The bankruptcy court concluded that the method proposed by PBGC is appropriate in this instance only after holding an evidentiary hearing at which expert witnesses testified as to various methods for calculating discount rates, as well as acknowledging its obligation to determine the present value of PBGC's claims in accordance with the overriding policy goals embodied in the Bankruptcy Code. Nevertheless, the bankruptcy court's applica-

tion of an improper standard of review may have prevented the bankruptcy court from fulfilling its statutory obligation to independently ascertain an appropriate discount rate. The bankruptcy court's legal conclusion that deference was due PBGC's interpretation is reversed and remanded to the bankruptcy court to make an independent evaluation.

## II. Duplication of Claims

 The Reorganized Debtors and the United Steelworkers challenge the bankruptcy court's order giving PBGC credit for the probable value, rather than the face value, of the minimum contribution claims. However, parties may not invoke the judicial power of the court unless the challenge raises an actual case or controversy. *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 5–8, 98 S.Ct. 1554, 1559, 56 L.Ed.2d 30 (1978). If a claim is "so insubstantial or so clearly foreclosed by prior decisions," then the claim may not proceed. 436 U.S. at 9, 98 S.Ct. at 1560. Because the bankruptcy court entirely disallowed the pre-petition portion of PBGC's minimum contribution claim, the underlying economic result is the same as if the cross-appellees prevail upon the duplication issue. Therefore, the duplication issue is foreclosed by the bankruptcy court's prior order and is moot.

## III. Joint and Several Liability

 The Reorganized Debtors contend that the bankruptcy court erred by applying joint and several liability. According to the Reorganized Debtors, requiring each of the Debtors to bear full responsibility for liability translates into a tenfold recovery for PBGC, while other unsecured creditors realize a single recovery. The Reorganized Debtors contend this violates bankruptcy principles of equal distribution among creditors and allows PBGC to unfairly inflate its claims. Furthermore, the Reorganized Debtors claim that joint and several liability is incongruous with ERISA's principles of controlled group liability, which treats commonly controlled businesses as one employer for liability purposes. The Reorganized Debtors also argue that Congress expressly provides that ERISA is subordinate to bankruptcy law under 29 U.S.C. § 1144(d).

PBGC maintains that the Debtors are properly obligated for joint and several liability under ERISA, which governs the validity and amount of these claims. PBGC asserts that the plain language of ERISA clearly imposes joint and several liability. PBGC denies that it is similarly situated to other creditors, conversely, it has a statutory claim against each of the ten debtors, not just one.

"As in any case of statutory interpretation, we begin with the plain language of the law." *Federal Deposit Insurance Corp. v. Canfield*, 957 F.2d 786, 787 (10th Cir.1992) (citing *United States v. Morgan*, 922 F.2d 1495, 1496 (10th Cir.), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2803, 115 L.Ed.2d 976 (1991)). Under ERISA, Congress expressly provides:

> In any case in which a single-employer plan is terminated in a distress termination under section 1341(c) of this title or a termination otherwise instituted by the corporation under section 1342 of this title, any person who is, on the termination date, a contributing sponsor of the plan or a member of such a contributing sponsor's controlled group shall incur liability under this section. The liability under this section of all such persons shall be joint and several.

29 U.S.C. § 1362(a) (Supp.1994); *accord* I.R.C. § 412(c)(11)(B) (1988 & Supp.1994); 29 U.S.C. § 1082(c)(11)(B) (Supp.1994). Next, " '[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' " *Federal Deposit Insurance Corp.*, 957 F.2d at 787 (citing *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 833–35, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842 (1990) (citation omitted)).

Here, Congress has clearly provided for the imposition of joint and several liability against the Reorganized Debtors, and it has not expressed any explicit, contrary legislative intent. Furthermore, PBGC's position is consistent with the case law. *See Tavery v. United States*, 897 F.2d 1032 (10th Cir.1990) (regarding claims against joint obligors as distinct and separate, including application to joint income tax returns). The bankruptcy

court aptly stated that ERISA's express mandate of joint and several liability "may well impact adversely on other creditors, but the principles of equal distribution to creditors are not so offended as to override the direct intent of Congress under ERISA." (Bankr.Ct.'s Mem.Decision & Order, dated 10/2/92 at 9.) This Court affirms the bankruptcy court's order allowing joint and several liability.

## CONCLUSION

On PBGC's appeal, all aspects of the bankruptcy court's decisions are AFFIRMED except that portion concerning the duplication of claims, which is moot. As to the cross-appeal, all decisions of the bankruptcy court are AFFIRMED with the exception of the bankruptcy court's determination of the appropriate discount rate. To the extent the bankruptcy court deferred to PBGC in arriving at the appropriate discount rate, such deference was improper. As to that issue only, the case is REMANDED for an independent discount rate determination without any deference to the position of PBGC.