**In re KENT PLASTICS CORPORATION, Debtor.**

Bankruptcy No. 91–70019–7.

United States Bankruptcy Court,
S.D. Indiana,
Evansville Division.

June 2, 1995.

James M. Carr, Indianapolis, IN, for debtor.

Robert P. Doolittle, Jr., Trustee, Vincennes, IN.

## ORDER

BASIL H. LORCH, III, Bankruptcy Judge.

This matter was initiated by the filing of **Trustee's Application to Pay Chapter 7 Administrative Expenses; Application to Determine, Disallow and Partially Pay Chapter 11 Administrative Expenses** and subsequent Objections thereto by Pension Benefit Guaranty Corporation ["PBGC"]. Upon request of the parties, the Court granted the parties leave to brief the issues related to the status of PBGC's claims. PBGC's **Brief in Opposition to Trustee's Objections to PBGC's Claims** was filed on November 1, 1994. The **Trustee's Brief in Opposition to Priorities Claims of Pension Benefit Guaranty Corporation** was filed on December 19, 1994, and the **Reply Brief of Pension Benefit Guaranty Corporation** was filed January 10, 1995.

The Court, having considered the foregoing arguments of counsel and having reviewed the pleadings and applicable law, and being otherwise fully and sufficiently advised, hereby FINDS that PBGC's claims for administrative expense priority must be DENIED for the reasons set forth in the attached Memorandum.

**IT IS SO ORDERED.**

## MEMORANDUM

The Court notes, initially, that it has jurisdiction over this matter pursuant to 28 U.S.C. Section 157; 28 U.S.C. Section 1334; 11 U.S.C. Section 523; and the Standing Order of the United States District Court for the Southern District of Indiana effective since July 11, 1984, which automatically refers bankruptcy cases and proceedings to this Court for hearing and determination. This matter is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2)(B).

### Procedural Background

1. On June 4, 1992, PBGC filed two proofs of claim against Kent's bankruptcy estate.

2. On June 9, 1994, the Trustee applied to pay all but $14,219.57 of the $248,156.16 in the estate to holders of certain administrative expenses ["Application"]. The proposed distribution did not include PBGC.

3. On July 11, 1994, PBGC objected to the Application, and filed two proofs of claim amending the claims it filed on June 4, 1992.

4. On August 11, 1994, the Trustee objected to the claims filed by PBGC on June 4, 1992, and amended on July 11, 1994, to the extent PBGC sought priority status for these claims.

5. On August 16, 1994, PBGC filed an additional proof of claim against Kent's bankruptcy estate.

6. On August 30, 1994, the Trustee objected to the claim filed by PBGC on August 16, 1994, stating that this claim was untimely and not entitled to priority.

7. On October 11, 1994, the Court granted the parties Joint Motion for Continuance of Hearing Pending Resolution of Legal Issues, whereby the parties requested leave to brief the issues relating to the status of PBGC's claims in bankruptcy, leaving other procedural and substantive issues relating to PBGC's claims upon resolution of said status. The matter was fully briefed on January 10, 1995.

### Statement of Facts

On or about January 11, 1991, the debtor, Kent Plastics Corporation ["Kent"] filed its Chapter 11 petition and operated as a debtor-in-possession until January 21, 1992. On that date, the Court entered its order converting the case to Chapter 7 and appointing Robert P. Doolittle, Jr., as the Interim Trustee. Following the first meeting of creditors, Robert P. Doolittle, Jr. continued to serve as the Case Trustee and is presently the acting Trustee.

Following conversion of the case, the Trustee filed his **Inventory and Application to Abandon**. The Court entered an Order

abandoning all but a few designated assets of Kent on February 5, 1992. The major assets administered by the Trustee have been choses-in-action to recover preferential transfers and pending lawsuits for the recovery of funds due to Kent.

On June 9, 1994, the Trustee applied to pay all of the Chapter 7 administrative expenses in the sum of $55,936.59 and pro rata distribution to creditors holding valid Chapter 11 administrative expense claims. The Trustee objected, in said Application, to several other claims seeking Chapter 11 administrative expense status. The Trustee had on hand $248,156.16 for distribution at the time of Application, which amount is insufficient to pay the allowed Chapter 11 administrative expenses in full. Additionally, all of the debtor's known assets have been administered and liquidated with the exception of a pending action against Marine Midland Bank.

The Pension Benefit Guaranty Corporation ["PBGC"] objected to the Trustee's Application on July 8, 1994, claiming that its own claims should be considered for payment as Chapter 7 administrative expenses, Chapter 11 administrative expenses, or that its claims should be entitled to other priorities within the Chapter 7 phase of this case. PBGC filed additional claims seeking priority status for varying amounts on July 11, 1994, to which the Trustee objects.

Congress adopted the Employee Retirement Income Security Act of 1974 ["ERISA"] and created the PBGC to administer, and insure, the termination of private "defined benefit" pension plans. When an underfunded pension plan terminates under ERISA, PBGC takes over the assets of the plan and pays guaranteed benefits to plan participants and beneficiaries. PBGC also has the power to assert claims against the responsible parties for both the amount of any unpaid contributions to the plan and the amount of the plan's underfunding.

ERISA established certain categories of statutory liens to provide the government with a mechanism for recovery of claims against pension plan sponsors. For instance, when a plan terminates with unfunded benefit liabilities ["UBL"] under Title 29 Section 1362, and the employer/sponsor does not honor the government's demand for payment of the UBL, a lien is created in an amount not to exceed 30% of the net worth of the contributing sponsor and its affiliated entities (the "Control Group"). 29 U.S.C. Section 1368. Also, as to the minimum funding requirements of ERISA, the statute provides for a lien in favor of the plan that attaches if the deficiency exceeds one million dollars. 29 U.S.C. Section 1082(f).

The issues now before the Court involve the priority of three bankruptcy claims asserted by PBGC against Kent in relation to the Kent Plastics Corporation Employees Retirement Plan ["Plan"]. The largest claim, for $451,800.00, is for the amount of the Plan's underfunding as defined by ERISA. PBGC contends that the entire claim should receive priority as a Chapter 7 administrative tax expense. A second claim, for $282,599.00, is for amount owed to the Plan pursuant to the minimum funding requirements of ERISA and the Internal Revenue Code ["IRC"]. PBGC alleges that of this claim, $46,689.00 should receive priority as a Chapter 11 administrative expense and that $9,922.00 of this claim should receive priority under section 507(a)(4) of the Bankruptcy Code. The final claim, for $54,879.53, is for premiums, and interest and penalties thereon, allegedly owed to PBGC pursuant to ERISA. PBGC contends that $38,643.83 should receive priority as a Chapter 7 administrative expense, and $8,117.85 should receive priority as a Chapter 11 administrative expense.

## Discussion

The implementation of ERISA's goals in the bankruptcy forum has led to considerable confusion and has been the source of scholarly debate, congressional discussion, and judicial review. The PBGC's assertion that it is entitled to administrative priority has been strenuously contested nationwide.

■■■ 11 U.S.C. § 507 of the Bankruptcy Code sets out those claims which are entitled to priority in bankruptcy proceedings. Because of the presumption that the debtor's limited resources should be equally distribut-

ed among creditors, statutory priorities are narrowly construed. *Joint Industry Board v. United States*, 391 U.S. 224, 228, 88 S.Ct. 1491, 1493, 20 L.Ed.2d 546 (1968); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir.1976). "[I]f one claimant is to be preferred over others, the purpose should be clear from the statute." *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952). *See also, Matter of Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984).

Particularly in regard to employer termination liability, there remains definite conflict concerning the priority to afford the PBGC's claim for UBL. That conflict surrounds the government's contention that its UBL claim is on a par with federal tax claims under section 507(a)(7) of the Bankruptcy Code. PBGC contends that the claim itself, not the perfected lien, is entitled to tax priority. The distinction is significant because of the need to perfect a lien prior to filing, since otherwise, the automatic stay will prevent perfection. If the claim has priority, this problem goes away.

### A. *PBGC's Underfunding Claim*

█ PBGC's largest claim of $451,800.00 represents the amount of the Plan's underfunding as defined by ERISA. PBGC contends that the UBL claim is a tax entitled to priority as a Chapter 7 administrative expense under Section 503(b)(1)(B) of the Bankruptcy Code, relying in large part upon the following language: "In a case under title 11 or in insolvency proceedings, *the lien imposed under subsection (a) of this section shall be treated in the same manner as a tax* due and owing to the United States for purposes of title 11 [or] section 3713 of title 31." 29 U.S.C. Section 1368(c)(2) (emphasis added). Alternatively, PBGC asserts that the UBL claim is a priority tax under Section 507(a)(7) of the Bankruptcy Code which affords priority to certain unsecured claims of governmental units for taxes and customs duties.

29 U.S.C. Section 1368(a) addresses the creation and treatment of PBGC's lien securing the employer's liability under section 1362, 1363 or 1364. The statute reads as follows:

> If any person liable to the corporation under section 1362, 1363, or 1364 of this title neglects or refuses to pay, after demand, the amount of such liability (including interest), *there shall be a lien* in favor of the corporation in the amount of such liability (including interest) upon all property and right to property, whether real or personal, belonging to such person, except that such lien may not be in an amount in excess of 30 percent of the collective net worth of all persons described in section 1362(a) of this title. (emphasis added)

Further, the statute provides:

> In a case under Title 11 or in insolvency proceedings, the lien imposed under subsection (a) of this section shall be treated in the same manner as a tax due and owing to the United States for purposes of Title 11 or section 3713 of Title 31.

29 U.S.C. Section 1368(c)(2).

Thus, a lien arises after the PBGC makes a demand, and the employer fails to pay, the liability. The question before the Court is whether the underlying claim is entitled to tax priority or only the ERISA lien is to be treated as a federal tax lien. There is no dispute in this case that no demand was made pursuant to Section 1368.

█ If only the ERISA lien is to be treated as a tax lien, then the automatic stay would prohibit the post-petition creation and perfection of a security interest in the debtor's assets. 11 U.S.C. Section 362(a)(4) and (5). Although ERISA exempts termination of a plan from the automatic stay, there is no language which purports to exempt the imposition of a lien from the automatic stay. *See,* 29 U.S.C. Section 1342(f). Absent express language to the contrary, the Court will not extrapolate statutory language to modify the rules affecting security interests in bankruptcy.

Reviewing the legislative history of the applicable statute, it is not clear that Congress even considered whether an ERISA claim is to be treated on a par with a federal tax claim. Subsequent legislation has been proposed in an attempt to resolve the ambiguity as to whether a non-perfected PBGC

"lien" claim is to be accorded priority status [1] but the proposed change was not included in the recent Bankruptcy Reform Act of 1994.

This Court, therefore, adopts the logic of that line of cases holding that an ERISA claim is not synonymous with a federal tax claim under 29 U.S.C. Section 1368(c). In *In re Divco Philadelphia Sales Corp.*, 64 B.R. 232 (Bankr.E.D.Pa.1986), the court stated:

> ... While it is clear that an ERISA lien for employer liability is to be treated as a tax lien for purposes of priority, § 1368 does not state that the underlying ERISA liability is a tax liability. Section 1368(c) merely provides that an ERISA claim and a tax claim share one feature in common— liens of both share on a par. It is certainly a leap of faith then to say that because one shares a single trait in common with the other, the two are identical. Applying this logic, one could say that a donkey is the same as an elephant simply because they both have four legs. We accordingly conclude that 29 U.S.C. § 1368 does not render an ERISA claim a tax claim within the meaning of Bankruptcy Rule 2002(j).

Likewise, the Court concurs with the logic expressed by Judge Lifland in the *Chateaugay* case, which the government urges the Court to disregard for lack of precedential value. *See, In re Chateaugay Corporation,* 115 B.R. 760 (Bankr.S.D.N.Y.1990), *aff'd,* 130 B.R. 690 (1991), *vacated by consent of the parties,* 17 Employee Benefits Cas. (BNA) 1102, 1993 WL 388809 (S.D.N.Y.1993). Although the decisions were vacated upon settlement, the analysis contained therein is valid and has been relied upon in at least one other instance to hold that the obligation to pay minimum funding requirements is a prepetition debt not entitled to priority insofar as it relates to prepetition labor by the debtor's employees. *In re Finley, Kumble, Wagner, et al.,* 160 B.R. 882 (Bankr.S.D.N.Y. 1993). That court also made reference to the statutory ambiguity by footnote:

> We note that recent attempts to amend § 503(b) to include minimum funding contributions among the list of administrative priorities played no role in our decision. According to statements in the Congressional Record, the proposed changes seek to overturn rulings made in the LTV case. *See, e.g.,* 138 Cong.Rec. S8241–01, S8268 (daily ed. March 3, 1993). Despite these legislative efforts, the LTV opinions remain the most thorough and thoughtful analyses available of the pension-related issues presented herein. *See, e.g., In re Chateaugay Corp., supra,* 115 B.R. 760. Indeed, to disregard such a valuable body of caselaw in favor of a possible legislative enactment would entrust the rule of law to a mere proposal not yet set for a vote, much less signed into law. For evidence of the mercurial nature of the legislative process, one need look no further than a more recent bill, i.e., The Bankruptcy Amendment Act of 1993, S. 540, where the heightened priority of minimum funding claims is noticeably absent.... despite PBGC's invitation to the contrary, we choose to follow well-reasoned case law 'so that the symbol of our profession may remain the scales, not the seesaw.' *Patterson v. Shumate,* [504] U.S. [753, 766], 112 S.Ct. 2242, 2251, 119 L.Ed.2d 519 (1992) (Scalia, J., concurring).

*Id.,* 160 B.R. at 893, n. 24.

Therefore, concluding that the ERISA claim is not equivalent to a federal tax claim, the Court finds that PBGC must look to the lien enforcement scheme set forth in 29 U.S.C. § 1362. Insofar as no demand was made for payment prior to filing, the Court finds that the ERISA lien never came into existence. The priority granted under § 1368, therefore, is inapplicable.

---

1. On March 24, 1992, Representative Robert H. Michel (R–Ill.) introduced a bill, The Pension Security Act of 1992, [H.R. 4545, 102d Cong., 1st Sess.] which is designed to award tax priority status to certain pre-petition claims of the PBGC that arose post-petition. An identical companion bill was introduced in the Senate by Senator Robert Dole (R–Kan.) on March 26, 1992 [S. 2485, 102d Cong., 1st Sess.]. No action was taken and the legislation died with the 102d Congress.

For a more thorough discussion of the legislative history, see James W. Giddens, *Attempting to Protect Employee Retirement Income Within Bankruptcy Reorganization: PBGC Efforts to Obtain Priority Status,* 12 Ann.Rev.Banking L. 397 (1993).

■ PBGC alternatively suggests that its claim is entitled to priority under § 507(a)(7). Section 507(a)(7) sets forth various specific categories of taxes which shall be entitled to priority. Notably, however, there is no specific reference to PBGC or ERISA claims. It has long been held that courts must construe statutes according to their plain meaning. *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *U.S. v. Ron Pair Enterprises*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Matter of Voelker*, 42 F.3d 1050, 1051 (7th Cir.1994). The Court, looking at the plain language of Section 507, finds that the statute does not grant priority to the PBGC's UBL claim.

B. *PBGC's "DUEC" or Minimum Funding Claim and Claim for Premiums*

■ The government seeks $46,689.00, which represents the unpaid post-petition minimum funding contribution owed by Kent to the Plan. PBGC contends that such claim is entitled to priority under 11 U.S.C. §§ 503(b) and 507(a)(1) as an actual and necessary expense of preserving the estate. Further, PBGC seeks $54,879.53 in unpaid premiums, interest and penalties under 29 U.S.C. § 1307(a) and (b). PBGC alleges that, of that amount, $8,117.85 arose pre-petition, $8,117.85 arose during the administration of the Chapter 11 estate, and the remaining $38,643.83 arose during the administration of the Chapter 7 estate.

■ Traditionally, expenses are deemed administrative only if they arise out of transactions between the creditor and the trustee or the debtor in possession and "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *Mammoth Mart, supra*, 536 F.2d at 954; *Jartran, supra*, 732 F.2d at 587. A debt is not entitled to priority merely because the right to payment arises after the debtor in possession has begun managing the estate. *Id.*

The Court agrees that certain post-petition costs incident to the operation of a business are entitled to administrative priority under section 503. PBGC cites the Court to numerous cases finding that the costs of complying with a regulatory scheme are administrative expenses regardless of whether a benefit is conferred upon the estate. However, those cases are distinguishable from the case at bar.

■ While certain expenses payable after the bankruptcy filing may be entitled to administrative priority, the timing of the payment cannot be the determinative factor in granting administrative status. Instead, the Court must look at the post-petition operations of the debtor and the relationship between those operations and the post-petition accrual. In the environmental cases cited by PBGC, the statutes must be complied with in order for the debtor to continue operations, therefor it's a necessary cost of doing business and essential to reorganization. Likewise, if the expense was related to the post-petition work of employees of the debtor-in-possession, it would be deemed administrative. In this case, however, the Employees' Retirement Plan was frozen six years prior to the bankruptcy filing. The expenses that the PBGC now seek to claim as administrative bear no relation to the ongoing affairs of the debtor-in-possession while in Chapter 11, and certainly provide no benefit to the liquidating Chapter 7 estate.

Other courts have rejected PBGC's argument that minimum funding contributions, like compliance with regulatory schemes, are a "cost of doing business" during reorganization. *See, In re CF & I Fabricators of Utah, Inc.*, 179 B.R. 704 (D.Utah 1994); *In re Amarex, Inc.*, 853 F.2d 1526, 1530 (10th Cir. 1988). In the later case, the court adopted the two-pronged test espoused by *Mammoth Mart* for determining which claims qualify for administrative status. The minimum funding claim and the premium claim fail the *Mammoth Mart* test on both levels. The contributions neither benefit the debtor-in-possession in the operation of the business, nor do they arise out of a transaction between the creditor and the debtor-in-possession. Because the debtor's minimum funding

liability is based upon and related to pre-petition services, as is the premium claim, the Court finds that these claims are not entitled to administrative priority status under § 503.

### Conclusion

The Court recognizes the laudable public policy supporting the funding of retirement plans. To accord these claims priority in bankruptcy, either by deeming them taxes or classifying them as administrative expenses, might well serve that policy. The impact on the administration of bankruptcy estates, however, would be significant. It is the job of the legislature to weigh the conflicting interests, represented by ERISA and the Bankruptcy Code, and to reconcile those laws. Congress knows how to grant priorities in bankruptcy and to provide for exceptions to the automatic stay. It has declined, for whatever reason, to make such provisions for PBGC's claims.

It is for the courts to strictly interpret the statutes handed down by Congress. As noted hereinabove, many recent decisions of the United States Supreme Court have emphasized such a "plain meaning" approach when reading the Bankruptcy Code. This Court may neither construe "lien" to mean "claim" nor ignore the clear language of §§ 362 and 503 in deciding this case. The plain meaning of the statute supports the Trustee's position herein and dictates a finding that PBGC's claims be treated as unsecured.

**IT IS SO ORDERED.**